UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| STEPHEN WETHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 09-284-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MICHAEL J. ASTRUE, Commissioner of | ) | **AND ORDER** |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The plaintiff, Stephen Wethington, brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of an administrative decision of the defendant, Commissioner of Social Security ("Commissioner"), which denied his April 18, 2006, applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons provided below, the Court reverses and remands the administrative decision for further proceedings.

**FACTUAL BACKGROUND**

Born in 1964, Stephen Wethington had held various jobs; he had been a telephone lineman for the Army, an electrician, and a mechanic. Transcript ("Tr.") at 23, 25, 29, 31. On December 10, 2004, he allegedly became disabled and stopped work. *Id.* at 31, 301. That day, Wethington had a mydocardial infraction, commonly known as a heart attack. *Id.* The night of his heart attack, he developed pain and went to the emergency room. *Id.* at 266. His doctor found a descending lesion and, thus, placed a stent in his left artery. *Id.* at 13, 266.

About a month after his heart attack, on January 3, 2005, Wethington saw his family doctor, Dr. James Duncan. *Id.* at 31, 286. Wethington had a regular heartbeat during that visit. He was diagnosed with coronary artery disease. *Id.* at 286. Before the heart attack, Wethington was never diagnosed with a blood pressure or a cholesterol problem. *Id.* Dr. Duncan believed that Wethington sustained what could have been a fatal heart attack. *Id.* at 113, 286. Further, the doctor recommended that Wethington look for nonexertional work and was not sure whether Wethington could ever maintain full active employment as an electrician. *Id.*

On February 19, 2005, Wethington had a chest x-ray. *Id.* at 307. Dr. Timothy Whitt's report stated that Wethington's lungs were hyperinflated, which suggested that he had chronic obstructive pulmonary disease (a disease that makes it hard to breathe). *Id.* But there was no evidence of cardiopulmonary disease, which could affect the heart and lungs. *Id.* Dr. Whitt did not find any significant change when the x-ray was compared with a October 1, 2001, examination. *Id.*

In July 2005, Wethington saw Dr. Duncan again. *Id.* at 522. He was still having some chest pain but its onset varied. *Id.* He also continued to have shortness of breath. *Id.* His ejection fractions, the fraction of blood pumped out of a ventricle with a heart beat, had returned to normal at that time. *Id.*

During this time period, Wethington became a familiar face in the emergency room. On January 18, 2006, he returned there due to atypical chest pain. *Id.* at 266-67. Dr. John Aumiller, a cardiologist, treated him. *Id.* Wethington had been out climbing ladders and doing gutter work the previous day. *Id.* He had tried to return to work in late 2005. *Id.* at 36-37. Nothing was

particularly abnormal in his medical evaluations during that visit. *Id.* at 13. On February 2, 2006, Dr. Duncan noted that the chest pain Wethington experienced was muscoskeletal, meaning chest pain from the chest wall itself rather than chest pain related to the heart. *Id.* at 283. Dr. Duncan also found that Wethington had sleeping and depression issues. *Id.*

On February 17, 2006, Wethington had a follow-up visit with Dr. Aumiller. *Id.* at 265. Dr. Aumiller noted Wethington's episodes of chest pain since his heart attack, including the one where he was hospitalized, but found that they were all atypical and inconsistent with his symptoms before his heart attack. *Id.* Dr. Aumiller concluded that Wethington's coronary artery disease was clinically stable.

On May 26, 2006, Wethington was hospitalized again—this time for two days—because of atypical chest pain. *Id.* at 323. Dr. Aslam Ahmad noted that Wethington has ostial stenosis, a narrowing of the mouths of coronary arteries, at 70% for his first diagonal branch and 70% for a small circumflex branch. *Id.* The vessels were too small for any intervention so Dr. Ahmad would only prescribe medication for his treatment. *Id.* On May 27, 2006, a cardiac catheterization revealed a minor coronary artery disease. *Id.* at 378. According to Wethington, the doctors told him that there was a blockage in his diagonal artery, but it would be hard to put a stent there to treat the blockage. *Id.* at 39.

On a June 19, 2006, visit, Dr. Aumiller noted that Wethington's blood pressure was too low. *Id.* at 378. Dr. Aumiller saw that Wethington had signs of a sleep disorder so he referred him to a sleep center. The sleep center study, done September 13, 2006, showed mild obstructive sleep apnea. *Id.* at 374, 445-46. On October 3, 2006, Wethington saw Dr. Aumiller

again and complained of exertional chest pain. *Id.* at 387. He felt the pain after he climbed stairs and when he prepped a wall for painting. *Id.*

On November 13, 2006, Dr. Charles E. Martin examined Wethington. *Id.* at 438. He noted Wethington's various ailments: chest pain, clinical depression, and back pain. *Id.* Based on his May 2006 catheterization, Dr. Martin did not think the disease was suitable for stenting or required surgery. *Id.*

In addition to cardiac issues, Wethington suffered from back pain. He had MRIs in September 2004 and May 2006. *Id.* at 309, 521, 529. Based on his last MRI, Dr. Duncan noted that there were mild degenerative changes. *Id.* at 512. Regrettably, Wethington suffered from mental health issues as well. He got treatment at Bluegrass Regional Mental Health Center from March to November 2006 for depression. *Id.* at 401-27.

## PROCEDURAL HISTORY THROUGH THE ALJ HEARING

Wethington filed applications for DIB and SSI on April 18, 2006. *Id.* at. 155-58 (SSI application); 159-63 (DIB application). The Social Security Administration denied Wethington's applications initially on September 27, 2006, *id.* at 62-65, and then again upon reconsideration on December 7, 2006, *id.* at 74-76. Thereafter, Wethington filed a written request for a hearing. *Id.* at 82-83. Subsequently, on January 30, 2008, Administrative Law Judge Roger Reynolds ("ALJ") conducted a hearing and heard testimony from Wethington and Jackie Rogers, a vocational expert. *See id.* at 19-57 (transcript of the hearing).

At the hearing, Wethington testified that he was diagnosed with a post traumatic stress disorder on August 31, 2006, after his heart attack. *Id.* at 23-24. He noted that he had one stent

put in and two heart attacks, but never had heart surgery. *Id.* at 25-26. He stated that his doctors considered bypass surgery but ultimately decided against it. *Id.* at 26-27. He claimed that he tried to go back to work twice after his heart attack in 2004. *Id.* at 35. However, after each attempt, he was admitted to a hospital for chest pain: once in January 2006 and once in May 2006. *Id.* at 29-30, 35-38. Wethington believes that he may have another heart attack because of his repeated chest pain. *Id.* at 49-50. He also had back pain from years of being a mechanic and has been referred to a back surgeon. *Id.* at 27-28. Wethington further testified that he suffers from back pain every day but the back surgeon would not perform surgery unless his condition got worse. *Id.* at 45-49. Because of his medication, he sleeps a lot and is unable to drive. *Id.* at 31.

The vocational expert, Rogers, reviewed the exhibits in Wethington's file and heard his testimony. *Id.* at 52. The ALJ presented Rogers with various hypotheticals. *Id.* at 54. He listed various physical limitations, many of which appear in Wethington's residual functional capacity ("RFC"), and then asked whether a person with those limitations at Wethington's age and experience level could perform any of Wethington's past relevant work. *Id.* at 54-55. Rogers said that such a person could not, but that he could perform unskilled work that requires a light level of exertion and a sedentary level of exertion. *Id.* at 55. The jobs only requiring a light level of exertion include: cashiers, machine operators, performing grading and sorting, and bench assembly work. *Id.* The jobs requiring a sedentary level of exertion include: bench assembly work, inspecting and checking work. *Id.* at 56. The ALJ presented a few additional variations of that hypothetical before the hearing ended. *Id.* at 56-57.

## THE ALJ'S DECISION

The ALJ issued a decision on June 25, 2008, finding that Wethington was not disabled and therefore not entitled to DIB or SSI. *Id.* at 18. In evaluating his claim of disability, the ALJ conducted a five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920.[1] At Step 1, the ALJ found that Wethington had not engaged in substantial gainful activity since December 10, 2004, the date he allegedly became disabled. Tr. at 10. At Step 2, the ALJ found that Wethington had the following combination of severe impairments: coronary artery disease status post percutaneous tranluminal coronary angioplasty and stenting, low back pain secondary to degenerative disc disease of the thoracic and lumbar spines, obstructive sleep apnea, and a major depressive disorder. *Id.* at 10-11. At Step 3, the ALJ found that Wethington did not have an impairment or combination of impairments that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 11-12. Thus, the ALJ could not find that Wethington was disabled on that basis. At Step 4, the ALJ found that Wethington's impairments prevented him from doing any past relevant work. *Id.* at 16. His past work required nonexertional limitations

---

[1] The Sixth Circuit summarized this process in *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003):

> To determine if a claimant is disabled within the meaning of the Act, the ALJ employs a five-step inquiry defined in 20 C.F.R. § 404.1520. Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry, which is the focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.

*Id.* at 474 (citations omitted).

beyond his RFC. *Id.* Considering Wethington's age, education, work experience, and RFC, the ALJ found at Step 5 that there were a significant number of jobs in the national economy that Wethington could perform. *Id.* at 17-18. Because of that finding, the ALJ could not find Wethington was disabled.

On July 28, 2009, the Appeals Council declined to review the ALJ's decision, *id.* at 1-4, at which point the ALJ's decision became the final decision of the Commissioner.

Wethington now seeks review of that decision here.

## DISCUSSION

Among other things, Wethington argues the ALJ improperly discounted the opinions of his three treating physicians. R. 14 at 5-7. Wethington is correct with respect to Dr. Aumiller's opinion. Because the ALJ failed to sufficiently state why Dr. Aumiller's opinion was inconsistent with objective medical evidence, as the regulations require, the Court reverses and remands the Commissioner's decision. 20 C.F.R. § 404.1527(d)(2) is "an important procedural safeguard for claimants for disability benefits" that the ALJ in this case disregarded. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

First, the ALJ had to decide whether the opinion of Dr. Aumiller, as a treating physician, should be given controlling weight. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion should not be given controlling weight, if it is "not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." *Blakley v. Comm'r of Soc. Sec*, 581 F.3d 399, 406 (6th Cir. 2009)

7

(quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)). The ALJ noted that on December 15, 2006, Dr. Aumiller concluded in a cardiac RFC questionnaire that Wethington could not perform sedentary work activities because of: coronary artery disease, chest pain, a previous heart attack, thoracic discs, and moderate sleep apnea. Tr. at 15 (citing *id.* at 470-76). Then, the ALJ found that Dr. Aumiller's opinion was "inconsistent with the objective medical evidence of record." *Id.* at 15. Presumably, the ALJ concluded that his opinion should not be given controlling weight. But the ALJ does not explain what evidence in the record conflicted with Dr. Aumiller's opinion. That was the ALJ's first error.

The ALJ *did* sufficiently state why the opinion of Dr. Duncan, another treating physician of Wethington, was given little weight. In Dr. Duncan's opinion, Wethington needed bypass surgery and he had herniated discs. *Id.* (citing *id.* at 389-93). The ALJ pointed out that there was evidence that Wethington did not require bypass surgery nor did he have herniated discs. *Id.* at 15. Because of those inconsistencies, the ALJ gave Dr. Duncan's opinion little weight. He should have given a similar explanation when discrediting Dr. Aumiller's opinion for being inconsistent. He did not.

In some cases, there is evidence so clearly inconsistent that a remand is unnecessary. *Wilson*, 378 F.3d at 547 ("[I]f a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe [C.F.R. § 404.]1527(d)(2) may not warrant reversal."). This is not such a case. Here, Wethington's records contain substantial evidence of cardiac issues and back pain sufficient to cause a disability. In fact, the ALJ noted that "the claimant's medically determinable impairments could reasonably be expected to

8

produce the alleged symptoms . . . ." Tr. at 13.  Wethington had a heart attack, was admitted to the hospital on multiple occasions for chest pain after the heart attack, and was under consideration for back surgery.  Dr. Aumiller's opinion is hardly "patently deficient."  Also, the inconsistencies that the ALJ found with Dr. Duncan's opinion do not apply to the portion of Dr. Aumiller's opinion that the ALJ cites.  Dr. Aumiller did not find that bypass surgery was necessary or that Wethington had herniated discs.  The inconsistencies in Dr. Duncan's opinion are of no help to explain why Dr. Aumiller's opinion was not given controlling weight.  They only demonstrate that the ALJ knew of his obligations under the regulations but failed to follow them when discrediting Dr. Aumiller's opinion.

Under the reason-giving requirement, the ALJ also had to state "good reasons . . . for the weight" he assigned Dr. Aumiller's opinion.  § 404.1527(d)(2).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 406-07 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5).  In other words, even after finding that Dr. Aumiller's opinion was not given controlling weight, the ALJ had to state why he assigned the opinion a particular weight.  Here, although the ALJ does not explicitly state the weight that he gives Dr. Aumiller's opinion, he appears to give it less than controlling weight because:  (1) Dr. Aumiller's conclusion was "inconsistent with the objective medical evidence of record," and (2) Dr. Aumiller was a cardiologist but based many of his limitations on a back condition.  *Id.*  Both of these reasons, consistency with the other evidence in the record and the doctor's specialty, are

acceptable considerations when assigning a weight to a treating physician's opinion. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). However, the first reason is not sufficiently stated. As discussed earlier, the ALJ needed to point out what objective medical evidence was inconsistent with Dr. Aumiller's opinion. He did not. As such, the ALJ's opinion also fails to fulfill the reason-giving requirement.

The ALJ made a third mistake but that mistake was harmless. The ALJ failed to state explicitly, as the regulations require, what specific weight he attached to Dr. Aumiller's opinion. § 404.1527(d)(2) ("When we do not give the treating source's opinion controlling weight . . . [we determine] the weight to give the opinion."); *see Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 246 (6th Cir. 2004) (stating that the "required explanation . . . is directed to explaining not just why these opinions do not warrant controlling weight, but should also explain what weight was given the treating opinions"). In this case though, the error was harmless because it is clear that he gave Dr. Aumiller's opinion little weight. The ALJ explicitly assigned "little weight" to Dr. Duncan's opinion because it was inconsistent with objective medical evidence. Tr. at 15. He similarly concluded that Dr. Aumiller's opinion was inconsistent. Thus, he would likely give Dr. Aumiller's opinion little weight. Of course, the ALJ could have given Dr. Aumiller's opinion something above or below the "little weight" he assigned Dr. Duncan's opinion. Yet, if the ALJ's only error was the assignment of the weight, the procedural safeguard function of

10

§ 404.1527(d)(2) would have been served. In that scenario, Wethington would know why the ALJ found Dr. Aumiller's opinion inconsistent with other evidence and that the ALJ did not think Dr. Aumiller, as a cardiologist, should consider back pain in his cardiac RFC. *See id*. Remanding just for this error would be a wasteful formality. *See Wilson*, 378 F.3d at 547 (citing *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969) (plurality opinion) (stating where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game")).

Nonetheless, there are errors here that do warrant reversal. That being the case, in addition to correcting his other errors, the ALJ should on remand also correct his harmless error, and assign the weight he gave Dr. Aumiller's opinion.

## CONCLUSION

Since the ALJ did not provide how Dr. Aumiller's opinion was inconsistent with the objective medical evidence in the record, this Court cannot provide a meaningful review and the case must be remanded. *See Blakley*, 581 F.3d at 410 (remanding because "the ALJ failed to follow the applicable procedural requirements in reaching her disability determination, which precludes meaningful review"). Importantly, the Court is not deciding the merits of Wethington's complaint. Rather, it is simply requesting more information from the ALJ so that it can provide meaningful review. *See id.* As the Court takes no position on Wethington's other arguments, the ALJ has the discretion to decide whether to address them on remand.

Accordingly, it is **ORDERED** as follows:

(1) The plaintiff's motion for summary judgment, R.14, is **GRANTED** to the extent it seeks a remand for more reasoning.

(2) The defendant's motion for summary judgment, R. 15, is **DENIED**.

(3) The administrative decision of the defendant is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

(4) **JUDGMENT** in favor of the plaintiff shall be entered contemporaneously with this opinion.

This the 9th day of March, 2010.

Signed By:
*Amul R. Thapar* AT
United States District Judge